Case number 21-1201 et al. Prohibition Juice Co. petitioner versus United States Food and Drug Administration. Mr. Navar for the petitioners. Mr. Kennedy for the respondent. Mr. Navar, good morning and please proceed. Your honors and may it please the court. Jared Navar for petitioners here. FDA's denials of the marketing orders requested were arbitrary and capricious and contrary to law. They were arbitrary and capricious first because of a lack of fair notice. And fair notice, as you know, is a fundamental principle of administrative law. If FDA changed the standard after the fact, the standard of evidence, then black letter law requires the court to remand these orders for reconsideration. And here, so the question is, did they change the substantive standard after the fact? And I believe the record here definitively shows that the FDA did change the standard. And the first thing I would point to is, as we've shown in the brief, if you compare the guidance, which FDA also points to in their brief, they said, you know, we didn't we didn't change anything. The petitioners had the benefit of our 2019 guidance document, which is in the record at starts at one oh four. And it's about a 50 page document that's providing guidance on, you know, the standards of evidence and how you know what kind of testing the FDA is requiring for these PMTAs. And but if if you you can read that document in detail and you will never see the specific statement of substantive standard, the evidence your standard that was stated in denial orders to petitioners requiring this hyper narrow comparison between the applicants flavored products versus the the same applicants tobacco flavored e-liquid juices. And in fact, the 2019 guidance definitively repudiates the FDA's argument here, because when you read it, as my clients were charged with knowledge of what's in that document, you read it and it affirmatively gives the applicants discretion to choose the relevant comparator products. In other words, it's it says, you know, it clearly leaves discretion to them to choose which products to compare. And it actually says to choose products in some places that are the most similar to the product that you want to get approval for, including in one place it refers to flavor type. So the notion, you know, revealed later that you're supposed to compare flavored products with the same applicants tobacco flavored products just is nowhere in that document. But if you go ahead. No, no, you go ahead. If you put aside the guidance document for a moment for your notice argument, just straight out arbitrary and capricious comparing the agency's reasoning to the statutory standard. What's wrong with their reasoning, which is that there's this one subcategory of e-cigarettes that has a distinctively high danger to kids and therefore the showing that they will require on the benefit side of the equation should be distinctively high. That seems pretty reasonable. Well, two responses to that, Your Honor. And the first is that we're not in a world where so if my clients might have a different issue to deal with if they had been required to file PMTAs, applications without the guidance having been issued. In other words, if the FDA just said, here's the statutory standard and we're going to judge it according to that. I understand that. I'm just I'm trying to disentangle a little bit. The fair notice slash reliance idea flowing from the guidance and just the what to me is the putting that aside the basic reasonableness of the FDA's reasoning here. Well, I mean, I think they would. Again, it's hard to compare because that would have been a different situation. But certainly we're not arguing the FDA does not have discretion to flesh out the statutory standard. That's their job. But they have to be held to the guidance that they put out after they put out guidance. Fair enough. But I guess where I'm going with this is if the reasoning is otherwise permissible and consistent with the statute and your argument really comes down to the guidance, what they said in the guidance, I would think you have to show that in some respect, the guidance was affirmatively misleading. And I look at it, honestly, there's a little bit there's something in it for everyone. You have a lot of statements in there that seem favorable to you. On the other hand, it's a pretty carefully hedged document. And they say a lot of other things that seem favorable to the FDA generally will need studies and a lot of weasel words in here. So the question is just can the final order be reconciled with the guidance? I don't know. I think you have a tough case on that point. Well, that's a fair question. I appreciate the question because it gets right to the heart of this issue. The problem is that the FDA left almost a blank slate. You're right, it's very amorphous. If we were just arguing under the guidance document itself, we would potentially have an argument that it's vague. It's hard to understand. There's really nothing to hold their scientific review documents in these technical review reports. They said, here's the scope of review by which we're reviewing these. And it's this very narrow question, which is just a very, it's one of the many types of comparisons that a petitioner could have thought, okay, well, we can try to do this test to meet the FDA's guidance. And then after the fact, once the game has started, the FDA adopted this hyper narrow standard. It's not that narrow. I mean, looking at the world in 2021 or 2020 to draw a distinction between flavored and unflavored, given everything that was happening in the world with kids, that doesn't seem hyper technical. Well, no, but it says draw a distinction between this applicant's flavored products versus this applicant's tobacco flavored products. And again, I accept the premise of the question that that would have been a reasonable comparator that makes sense. Flavored versus unflavored, given what they know about youth smoking. Well, right. And to go to your original question, Your Honor, the other point I wanted to make is that the FDA, which is part of our second argument for arbitrary capricious action, is that they've ignored the material distinction between device type. And that is not consistent with administrative law for them to, so they've tried to extrapolate because children migrated or high school students essentially migrated in the most recent survey from cartridges and pod systems to disposables. They've tried to extrapolate that and apply the same rule to these open tank systems, but they want to ignore the relevant distinction there, which is that disposables and cartridge systems appeal particularly to youth because of certain device type features, which FDA acknowledges in this brief here again, which is that they're easy to use and to conceal. And if you look at the 28J letter that the government filed last week, I believe, citing the migration to Puff Bar, I would welcome the court to look at that Wall Street Journal article because at the front of it, there's a photograph of what a Puff Bar is. And in the 2021 survey, Puff Bar is one of the disposable type of products, which is just a reference to my client's open tank systems. Can you just sketch that out a little bit more, where in the record, it's a world away. I'm not that familiar with these products, but I imagine it's the difference between a ballpoint pen and a fountain pen with a cartridge and a fountain pen that you actually have to stick into an inkwell. And not that many people use the last. And is that the sort of a fair analog that, you know, once the fountain pen with the disposable cartridge is unavailable, will people really migrate to the one where you have to dip it in the inkwell? Well, that's exactly the point. And in the record, so for an image of what the easy to conceal type products look like, Puff Bar is one which is in the Wall Street Journal article cited by the government. If you look at, it's not in the appendix, but it's part of the administrative record at FDA too. And we've, I was at the very beginning of that document, it's a large document with a bunch of studies in the administrative record. But one of the first ones, if he has some photographs, the first photograph in there is of an open tank system, which is, you know, similar to the e-juices that my clients manufacture would be used in those systems. And once it's, just to describe for us today, because I don't have that administrative record in front of me, once it's filled, it's bigger, bulkier, different from the cartridge ones or the disposable ones? Well, even before it's filled, Your Honor, because what, so it's got a big battery and atomizer and, you know, contraption at the bottom of it. And then at the top of it, there's a glass, usually a glass or plastic tank. And so, you know, I mean, it's a large contraption as Commissioner Gottlieb referred to it, just always, whether it's filled or unfilled. Got it. So I wanted to ask you a couple of questions about the marketing plans and the agency's failure to consider them. The FDA now takes the position that it's harmless error that they didn't consider your marketing plans because you don't propose any novel measures to control youth access that have not already been tried and failed to prevent the uptick that we've seen in youth use. So setting aside the formal question, which is, you know, I understand is a central one for you, whether it's error for the FDA to have quite candidly said they didn't even consider the marketing plan. You haven't contended that the plan you submitted that wasn't read contained any novel control measures. Have you? We, we, my response to that argument, Your Honor, is that the FDA is not allowed to engage in post hoc rationalization in the first. Right. I understand that. Absolutely. And I'm just trying to bracket that for purpose of the question because you've identified that as a defect. If they looked at it, what, what would have changed their mind? Well, I believe in our brief, Your Honor, and I'll try to flip through it while we're talking, if I can find the citation, but I think we, we outlined the bullet points, some for each petitioner here, the, the particular, you know, some of the particulars of their particular marketing plan and FDA has said, basically, you know, we've never seen anything before that, that, you know, we thought would work. But it's hard to understand where that judgment was made. If they issued the same NDO to all petitioners. Well, so I take it, the things that I read your marketing plan and I take it, the things that you point to where the age age checker gotten that, that the products are designed and really targeted and intended for people over 21 as you characterize them, the colors are not bright, although black with purple kind of graffiti-like lettering. I don't know. That's could be seen as kind of youth. Cool. But, but anyway, so, so the things that you point to are, we're really trying to prevent under 21s from getting on our website. We are, our marketing plans are to people who are addicted to combustible cigarettes. We're not packaging our stuff as juice boxes and the like anything qualitatively different from that. Well, no. And I found that you're on page 39 of our brief, which I'm sure you've seen. Great. But right. No, my, my response to it first, if we're addressing the substance of the question is, is that FDA unreasonably impermissibly stack the decks from the, from the first step of this they applied the same heightened evidentiary standard to all products, disregarding the material relevance of device type. And so they're, they're holding our marketing plans to a higher standard than, than should be. If you, if you go back and look at their guidance and where they specifically refer to, and this is around appendix page 133 to 140 or so 145, they, they repeatedly emphasize the relevance of device type in terms of health risk to various populations. And then, but they ignore those distinctions and apply this heightened evidentiary standard to everybody. And for that reason, they said, because there's this appeal to youth, we don't have to read your marketing plans. And that, that was impermissible. So you're saying that's, that's helpful. Cause I hadn't seen the two things as, as say marketing is relevant because if you had marketing mechanisms that could really bring down the youth risk, then the, a smaller amount of benefit to adults might suffice, right? So, so they're drawing a connection. And I guess you're also drawing connection. You're saying that the reason your somewhat traditional set of marketing measures was considered insufficient was because of this heightened evidentiary standard. Is that fair? That's, that's exactly right. And we say that at least in two places in the brief, I believe it's in the summary of the argument. And it's also in, it's in the argument itself, but where we do say that they stack the decks impermissibly from the beginning by, by applying this heightened evidentiary standard, which is premised on their ignoring the device type distinction. Right. So let me ask you sort of flip that if we disagreed and we, we haven't decided and we haven't conferenced, but just for purposes of argument, if we disagreed with your view that they had imposed a heightened evidentiary standard, do you still have a standalone claim based on the failure to consider the individual marketing plan that you submitted? Well, sure. Because the, the, the FDA made their bed, so to speak with, with the guidance that they put out and they have to lie. And what happened later is they got far more applications than they wanted to review or could review within the period of time that they wanted to. And, and so they, they, they came up with this way announces new narrow standard as a way to, you know, is that, you know, as they say in the guidance and as they say, again, in the final rule, this is supposed to be a holistic review and you're supposed to look at the particular product. The FDA has no evidence from any survey or anywhere else reflecting that a single youth has ever reported using any of these petitioners products. And so it's supposed to be a holistic review that should, that should inform the burden. So let's say, and again, this is just let's say the FDA at the beginning had said only longitudinal studies and randomized control trials, period. You might have a challenge to that, but let's say they said that and that that's what they applied and they held that your product failed and you thought, well, the standard is unfair, but they're right that my product fails under that. And they refuse to look at your marketing plan be enough for us to grant the petition and remand. Well, I would say no, because, but in that case, they would have made clear from the beginning that you need this particular type of study. And the problem here is that not only is it, and I want to be clear on this point because we're making the argument that the fatal flaw that they applied here was not merely requiring RCTs or longitudinal cohort studies as a type of study, but the, the, the substantive question that the, whatever evidence they reviewed is supposed to address was a new standard that was announced for the first time in this, um, July, 2021 memorandum. Um, and. All right. Anyone have any more questions? Uh, judge Kasson, just one thing just to, just to pin down, I had asked you about the novelty or not of your, uh, marketing measures and the FDA says, none of them, in fact, looking back, uh, uh, was novel and that the error was harmless. And the great brief doesn't dispute that. It doesn't dispute that none of the measures was novel and it doesn't dispute that the error standing on its own was harmless. Right. And I take it that that's your position because it's really about the, the connection between that and the, and the raised standard that you argue raised and narrowed that you've been arguing. Right. And, and, and the fact, I mean, there's a ton of information, these PMTAs, and we have to respond to what the FDA has done here. Um, and so we, you know, our, our response to that is that they can't retrospect, they can't post-hoc look back and say, well, it wouldn't have been, it would have been insufficient if we had looked at it because they That's helpful. Thank you. All right. Mr. Nava, we'll give you a couple of minutes in reply. Mr. Kennedy. Good morning. Good morning. And may it please the court, Scott Kennedy for the food and drug administration. I would like to begin by addressing something that council said a few moments ago. I think he asserted that, uh, in a part of the analysis, FDA didn't offer any evidence relating to whether or not these particular products are used by youth. And I think this is an important issue because it flips the statutory burden. Uh, to be clear, the tobacco control act requires FDA to deny an application to market a new tobacco product, unless the applicant can demonstrate that the marketing of that product would be appropriate for the protection of public health. Now the petitioners in this case, uh, manufacture a type of tobacco product that is especially likely to attract and addict kids, specifically flavored liquids that are used in e-cigarette products. And they come in names like gooey butter cake and root beer float and bubble gum, to name a few. Now in attempting to show that those products were nonetheless appropriate for the protection of public health, the petitioners submitted two categories of evidence to the agency. One was summaries of the general publicly available literature on e-cigarette use generally, not specific to the products in this application. Uh, and they also submitted some point in time surveys of customers that were distributed to customers at vaping shops and that solicited those customers views on things like perceptions and, and feelings about these products. Now FDA rejected this evidence and determined the petitioner's applications had failed to induce sufficiently strong evidence of a public health benefit in terms of helping smokers quit to offset these products, particularly high risk to youth. Um, so with that, I'd like to address for just a moment why FDA reached the determination and how it reached the determination that these one of the things I think that's key that FDA pointed to in addition to the fact that, uh, flavors not only encourage kids to start using e-cigarettes and kids not only have a strong preference in the marketplace for flavored e-cigarettes, but also the flavors in these e-cigarettes actually reinforce the addictive properties of nicotine by encouraging more puffs, more frequent using of the products, deeper inhaling. This is discussed at a 40 in the record in the decisional memorandum. And beyond that, there are a lot of harms associated with these products for kids beyond just their addictive properties. And this is also discussed in the decisional memorandum. Nicotine exposure can have permanent effects on the developing child's brain, including deficits in kids' attention, learning, and memory, and kids who use e-cigarettes are much more likely to end up using combustible cigarettes further down the road. This was a paramount concern, both to Congress in passing the Tobacco Control Act and to FDA because the vast majority of users of tobacco products start using when they're young and the vast majority of kids, over 90% according to one study, that use e-cigarette products say they started with flavored e-cigarettes. So the risk here is substantial and enormous to kids and FDA was looking for evidence sufficiently strong to offset that risk of a substantial enough benefit in terms of helping adult smokers quit to offset the substantial risk to youth raised by these products. So just returning one more time to petitioners' evidence and to what they submitted, again, there's two buckets here. There are snapshot consumer surveys that were administered in vaping shops and FDA rejected those because it explained that in the decisional memorandum here that point in time surveys like petitioners can't satisfy the standard because they don't evaluate behavior change over time. And they also weren't specific, at least there were specific to the products in the application. But also consumer perception surveys like this focus on what FDA called precursors to behavior, things like perceptions of the user, which also don't reliably indicate actual changes in behavior. They're questions about, you know, what do you think about these products? Do you like flavored products? Do you think they help people quit? Do you think they help you quit? That doesn't actually track a behavior change over a period of time, which FDA determined is critical, consistent with its earlier guidance. Also, the publicly available literature. Now, again, the other bucket of evidence that was offered by the petitioners here to FDA were summaries of the general publicly available literature on e-cigarette use and its effects generally in society. Now, FDA reviewed, canvassed the body of publicly available literature, discussed it in the decisional memorandum, and determined that on the question that's really key here, whether or not flavored e-cigarette products confer some benefit, some differential benefit that's substantial enough over unflavored tobacco flavored comparators, that the publicly available research is inconclusive on that question and quite mixed, as FDA put it. And, you know, importantly on this question, Prohibition Juice, their survey of the publicly available literature reached the exact same conclusion. It said, quote, there is not enough evidence from well-designed studies to determine whether e-cigarette flavors aid in smoking cessation, end quote. So, Kenny, what about Mr. Navar's point that you've compared, you've effectively treated their open systems as if they were closed system, disposable, or cartridge? Well, two points about that, Your Honor. The first is that FDA discussed the device type issue and the distinctions between these device types specifically in the decisional memorandum. And the key determination FDA made here is that having reviewed the evidence, particularly from the last few years and the market trends in the last few years, it became apparent to the agency that youth preferences for device types and all the different attributes of device types was fluid and tended to change, whereas the youth attraction to flavor and the youth preference for flavor is constant across all of the device types. And it reached this conclusion by looking at the fact that, for instance, historically youth had preferred a particular device type, was cartridge-based devices to be specific, but they had initially exhibited a preference for that kind of device type. Once that device type became less available on the market, kids didn't stop using e-cigarettes. What they did instead was migrated, flooded towards a different device type that was previously unpopular with youth. And that was, you know, originally the disposable device types. And FDA essentially found that it was playing whack-a-mole with this approach, that you couldn't just focus on one particular device type because the youth migration further underscored, in addition to the evidence I discussed earlier, that flavor is the fundamental thing driving youth appeal of these products. So that's the key finding here, that these differences between device types at this point and based on the evidence, including all of the marketing trends over the last couple of years, revealed that youth will migrate towards any remaining available device type that delivers flavored products to kids, even if the other device types that were previously popular are taken off the market. That was the conclusion. Penny, what would be the correct remedy if petitioners win? If we were to vacate the denial order, would their products remain off the market because they haven't yet gotten an approved marketing order? Or would they get another grace period while their application is pending? Or is there some other reason why it would make a difference to their ability to market? Well, to be clear, the products at issue here were illegal ever since the deeming rule took effect, the deeming rule that brought them within the ambit of the TCA and its prohibition. But then the FDA put an enforcement withholding order into effect until the Maryland federal court ruled. And then I gather the FDA scrambled and has very quickly dealt with a flood of applications. But I'm just wondering what the status quo is, because frankly, and I know this is not in the record, but I believe that a lot of these products are available online today. And so I'm a little bit, it makes me think I'm missing something about the status quo. And then I also am unclear about what would happen if we were to grant the petition and how that, so I'm unclear about the status quo as a practical matter and a legal matter. And I'm unclear about what would happen as a remedial matter if the petition were granted. And either or both of you might be able to shed some light on that. Yes, Your Honor, starting with the last question in terms of the remedy here, if, well, the appropriate remedy under the APA, I'll start with this, would of course, if the court found some error would be simply to set aside the agency decision and remand for further proceedings consistent with that decision. But along those lines, the agency would then be obliged to proceed consistent with the court's opinion, depending on the nature of the issue the court had identified. But again, the default for these products is that they are illegal in the marketplace and the period of enforcement and discretion that FDA had exercised previously no longer applies to these products. So it remains true that they are illegal in the marketplace and that that was true even since 2016, since the deeming rule took effect, but it is true now. And they could be They're being sold. Well, I don't have specific information about which products are and are being sold. There are some that have been approved. To be clear, there are some tobacco flavored e-cigarettes that have been authorized to enter the marketplace. There may be other products that are still being sold, for instance, illegally, and that they could be subject to enforcement action. So it may be true that there are that category in addition to the ones that have been authorized. But there have been 11 products authorized to date for tobacco flavored e-cigarettes that also remain lawfully on the market. If I were a manufacturer and I had distributed some inventory of my product, would it be unlawful for the distributor then to sell? Where does the enforcement, where is it directed? Is it just the manufacturers? What about retailers, distributors? Your Honor, I don't have that specific information as to what the distinction between retailers and distributors would be. I mean, the Tobacco Control Act makes it illegal to market these products absent a marketing grant order from the FDA. So that is that is what's clear from the statute. So no one can market them as a retail matter. If I had, if I had during the grace, you know, the enforcement discretion withholding period, if I had bought a garage full of Prohibition Juice refills, I couldn't be lawfully selling those today. That's correct, because you would need a marketing grant order from the Food and Drug Administration in order to do that under the statute. And there's one other thing I'd like to return to that was discussed in the opening line of question. Can I ask just on the nuts and bolts of how these things work? I'm puzzled trying to absorb some of the numbers associated with the case. I think you've got 50,000 applications for 6 million products, some freakishly large set of numbers like that. So how do we, how do you think of the relevant product in a way that produces numbers like that? I would have thought that the number of manufacturers is, I don't know, maybe in the dozens and the number of flavors per manufacturer is maybe in the dozens. And that doesn't come anywhere close to 6 million. Well, if I understood your question correctly, Your Honor, there's two things to clarify there. One is you're correct that there is a very large number of individual flavors and individual products that have been subject to marketing denial orders. But the actual number of applications, meaning an application from a manufacturer, for instance, in this case, you could say that we have four applications from each of the four petitioners. The most up-to-date knowledge I have, this isn't in the record, but the most up-to-date knowledge I have is that there have been over 250 applications for much smaller number, but some of those applications do include a lot of individual flavored products. So those numbers can get pretty large. And I guess the reason I asked, I was, I'm curious to hear your views on the point that the government failed to consider the marketing plans, which to me is the strongest argument on the other side. And what I'm just trying to think about is what a marketing plan might look like. Is it something that's going to sort of read the same way, regardless of all the permutations? They just say, well, our marketing plan is we're only going to sell to licensed vendors or something, or is the marketing plan going to reflect this, to me, surprising level of detail with, you know, you might have this flavor or that flavor and this kind of product. How specific How specific are the marketing plans and what's your best shot at why the government can just stop reading them as you quite candidly said you did? Well, I think starting with your second question first, to be clear, FDA did consider the effect of advertising and sales access restrictions and found them to be insufficient to mitigate the substantial risk to kids from flavored e-cigarettes in part, because kids do obtain these products from friends and other sources. So I think as has been acknowledged in the earlier portion of the argument, that was discussed in the April 2020 guidance that was issued by the agency. And that document was referenced repeatedly throughout the decisional memorandum here. It's an integral part of the regulatory history of these products. The applicants were well aware of it. And I'll add that even in the decisional memorandum, FDA did expressly say that there were no known types of restrictions along these lines that were sufficient to mitigate the risk to youth and their FDA was none that you had seen based on the plans that you reviewed. And then you said you just stopped reviewing them. I mean, that, you know, if I get if I get 20 title seven cases in a row where the plaintiff hasn't made a sufficiently strong showing, I don't stop reading the briefs on the case. Well, there were two statements. I believe you're referring to a footnote in your honor's referring to a footnote in the decisional memorandum. And subsequent to the statement where FDA emphasized its review of prior applications, FDA also said that there are no known or FDA is unaware of any restrictions along these lines that are sufficient. And I think their FDA was referring to its experience more broadly. That experience includes the 2020, April 2020 guidance document and everything that it discussed. So it's broader than just the applications that were reviewed. And to be a little more concrete about that in terms of what was in the 2020 guidance, that document really canvassed the known universe of restrictions along these lines. It was actually quite specific and quite detailed. It discussed things that that have been attempted by by manufacturers in conjunction with FDA, including sophisticated age verification technologies, just to name one example, the very kinds of measures and also contractual penalties for retailers that don't comply with these age verification requirements, among many other things. Those are the very sorts of things that petitioners highlighted on page 39 of their brief. This is in, I guess it's Roman numeral footnote, Roman numeral 19 of the order, correct? Yes, I believe that's the case. It's theoretically possible that mitigation efforts could adequately reduce clearly reasonable thing to say as a general matter. Then you report that to date, none of the application applications that FDA has evaluated have proposed restrictions that are good enough. That's a statement about past cases that you've adjudicated. And then you go on to say, but so for the sake of efficiency, we are just not going to evaluate marketing plans and applications at this stage of review, which I think is more or less what I said earlier, which is you saw a bunch of plans that weren't good enough in past cases. And so you just stopped, just stopped looking at them in the cases before you. Well, there's one thing I'd like to add to that, which is again, the sentence after the one that mentions prior review of applications, FDA said, we are not aware of restrictions that to date have been successful. And again, in the 2019 guidance, the conclusion was actually quite broad. It was that categorically as a category, these kinds of restrictions were not sufficient. The way FDA put it at one point is focusing on how the product was sold would not be sufficient to address youth use of these products. That's an A94 in the record. Okay, Mr. Cady, let's imagine a counterfactual that my company or that Prohibition has come up with a technology that requires a fingerprint ID. And you can only buy if you're on some database that confirms like driver's license, it confirms that you're over 21, that it's proprietary. They haven't announced it publicly. They put it on the application. They want to get out ahead of the curve. And because the FDA, which I understand as an expert engaged in this area has been monitoring these kinds of age dating technologies is unaware of this. And it comes through with this crush of applications, isn't the FDA's position? Well, it's good enough for us not to even look. Whoops, we didn't find out that there was this really cutting edge technology because we didn't even look. Why is that not as a matter of administrative law, a reason that we would have to grant the petition here? Well, two reasons, Your Honor. First of all, it's not actually even hypothetical, and Your Honor may be aware of this, but there are three applicants that are known to date to have proposed this kind of novel restriction. There's only one kind of restriction that prevents or helps to try to prevent youth access to these devices that FDA is aware of that goes beyond and proposes something new beyond what was addressed in the 2020 guidance document. And that's what's called device access restrictions. So these are the very sorts of things that Your Honor was referencing. One example could be a fingerprint scanner that attaches to a device and locks it unless the authorized user is using it. And with respect to those products, again, only three applicants to date have been known to propose those kinds of measures. Those applications are still in further scientific review, so FDA is still considering. How do you know this isn't one, or at least at the time of the disputed action, which is what we look at under Chenery, how would you know this isn't one of those if the agency is not looking at this time, even looking? Well, first of all, the three applicants that proposed those actually discussed them even outside the confines of their application and outside the confines of the marketing plan. You know the ad law precedents that bind us and that we do require that our decision making be on the record. You refer to harmless error. I wonder if encompassed within that would be, for example, a remand without vacature? Well, actually, first, Your Honor, and that's the second point I'd like to make. The petitioners in this case do not claim to have proposed anything along these lines. So as Your Honor correctly identified in the earlier questioning, petitioners have not identified or even suggested that there was anything novel or materially different in any way from the kinds of measures that FDA had determined to be insufficient in the 2020 guidance. And along those lines, there is no basis and no suggestion on the part of petitioners that they've proposed any kinds of device access restrictions like this. Right. That's a bit post hoc. So your position on remand without vacature? I'm sorry, could you clarify? Well, if we were to find that it was an error not to consider the marketing plan at all, but it was an error that we are confident given the record would be easily corrected on remand, would it be appropriate for us? Again, hypothetically, were we to find that to be error instead of you propose that we treat it as harmless error? And I understand that argument. Take that. Would it equally be appropriate to remand the agency without vacature? I don't believe it would be equally appropriate because to the extent that there is no harm that flows from the error that the court identified in its analysis, there wouldn't be any basis for any relief on the basis of that, because if there is no harm, there is no remedy that's appropriate. I think the court has the option short of if it identifies an error short of setting aside and remanding, it could remand without vacature. I think that is an option that's available to the court as an intermediate option. But I think the more appropriate relief there would be no relief because if the error is harmless, which we assert that it is, there's no basis for a remedy and no need for a remedy there. I'm curious about in the footnote where the FDA says it's not going to consider, says we're not evaluate at this stage of review. And I was just curious what that means. Is there a later stage or is this referring to this stage of sort of the review of the bulk of PMTAs or what? It's an important question because there are a number of applications for flavored e-cigarettes that are in that further stage of review, further scientific review. There's different terms for it, but undergoing further review to determine whether or not the products could be appropriate for the protection of public health. So FDA has been clear that these marketing restrictions are necessary, but not sufficient to render a product appropriate for protection of public health and for them to enter the marketplace. So there would need to be review of the marketing plan, it's FDA's position, before any product could be authorized and before any marketing grant order would be issued. And that marketing grant order could include requirements that certain marketing proposals and certain marketing restrictions be adopted. And as an tobacco-flavored e-cigarettes, a number of which have been approved, as I mentioned earlier, FDA has determined that in that context, tobacco-flavored e-cigarettes, they can be appropriate for the protection of public health, given their lesser risk to use under certain circumstances. And those circumstances would necessarily include things like specified marketing restrictions that can be agreed to or imposed upon the manufacturer before or when a marketing grant order is issued. So it would be necessary to review the marketing plans, and they are necessary, they're just not sufficient to establish the appropriate for the protection of public health standard at this stage. And because there was no other evidence, substantial or sufficient evidence in the applications of a substantial enough benefit for these products, in terms of helping smokers quit, particularly as compared to tobacco-flavored e-cigarettes, then that is why FDA determined here that it was not appropriate for the protection of public health to authorize these products, and they were denied. But in the application, with respect to the applications before us on review, those were final agency action as to which there are no further administrative proceedings, right? Those were denied outright. They were denied outright, and they are final agency action. There have been further administrative proceedings, one of which was mentioned in a Rule 28J letter that we filed with the court last week. However, they were final agency actions and are the subject of this appeal on review. Right. So, the statement in the footnote that for the sake of efficiency, we will not review the marketing plans at this stage of review is really a head-scratcher. And, I mean, the most plausible explanation is that this is just kind of a cut-and-paste. Like, your general position is you haven't seen one that's good enough yet, and that's the basis on which you're proceeding in all these cases. Well, no, Your Honor, to be clear, when that there had not been enough evidence in the applications of a substantial enough benefit, the application would be denied on that basis. That was essentially dispositive. However, there are other applications for flavored e-cigarettes that remain under review and that have gone through to that further stage of review and before any marketing grant. But if you just read the footnote within its four corners, it seems like the agency is approaching this problem in a way that would be, well, it's approaching it in a way you're saying you're pushing to a later stage of proceedings review of individual marketing applications, which kind of suggests that at some point you have to review the marketing applications, and you're just backloading a time-intensive issue for the sake of efficiency, as you say, which might make perfect sense if there's a later stage of proceeding when you are the manufacturer has submitted. Well, again, it is true, Your Honor, that they would look at it at a later stage of the review process prior to issuing any market grant order. But the reason not to look at it at this stage was because FDA had already found a dispositive issue. It had already found that there was an absence of a substantial enough benefit. And in the 2020 guidance as discussed, there was nothing about marketing proposals and restrictions that would sufficient to tip the balance by themselves in favor of granting these products and finding their appropriate protection of public health. So because there was already a dispositive basis here to deny the applications, that ended the analysis. But again, to the extent that these applications had submitted additional evidence, they would have gone through to that for the review. So in terms of the agency's reasoning, that last sentence is just kind of surplusage is your position, that for the sake of efficiency, we're going to we're going to actually read these things at some later stage of proceedings. Well, the way I actually view it, Your Honor, is a little bit like when a trial court, for instance, issues a dispositive decision on a case based on a sole issue like standing, for instance, and therefore does not proceed onto other issues where it would have to proceed to those other issues if it had not disposed of case on standing. But because it did, there was no need to proceed to those other aspects of the application. It doesn't mean they're irrelevant and it doesn't mean they would never be analyzed. It just means because you've identified a dispositive issue that can end the analysis right there. And there's no way for the marketing proposals to tip the balance and establish that these products are appropriate for the detection of public health for all the reasons FDA explained in the April 2020 guidance. Although it seems like it's a little bit more complicated that because the agency itself, as Mr. Navar brief points out, has said that marketing is really important and it can make a difference. And if it can make a difference, then it seems like you need to look at it to see how good it is to see whether it makes a big enough difference. So I think your analogy would have to be more like you're at a summary judgment stage. There's a piece of evidence that raises a very complicated evidentiary question about admissibility or not, let's say. And the court says, even if that evidence were admitted, it's not going to tip the balance because the evidence, the other evidence makes it clear which way this is going. So we're just going to predetermine consideration of that evidentiary question. We might need to in a case in which the other evidence were closer, but here it's not even close. The delta is not going to be made up by that evidence. So we're not going to go there. Well, I would disagree that the evidence was predetermined in this case, because again, the 2020 guidance categorically surveyed and canvassed the entire universe of these types of restrictions as categories. It looked at all of the different kinds of restrictions that are out there. So you're saying, assuming the best on the open question, assuming that this evidence is brought in and that it's totally believed, right, in my analogy, it's still not going to make up the difference. So that's what you're saying. We knew even if they had the best, they had contractual, I can't remember what you called those, but that all our distributors have to have some age verification and we're doing some kind of electronic thing. Even if they had everything known to marketing control against youth access, that still wouldn't be enough in this case. Is that what differentiates this case from a case that's further along in evidentiary review where the marketing plans will be looked at? Yes, I think that's right, Your Honor, because for instance, there have been other applicants that submitted additional evidence in the form of, for example, randomized controlled trials that do compare their flavored products to tobacco flavored comparators to assess whether or not they have an added benefit over those comparators in terms of helping smokers quit. And so those applicants and those applications are in that further scientific review stage now. And again, if any of them were to be issued a marketing grant, and we don't know yet, they're still in review and FDA is still assessing the strength of their evidence in the applications. But before FDA would issue any marketing grant or it would assess the marketing plans in order to ascertain whether or not they're substantial enough as part of the overall equation. But again, they're necessary, but they are not sufficient. And here, the applicants did not submit any evidence of a substantial enough benefit for their products to justify the authorization in this case. The benefit side of the equation was too empty for any marketing restrictions to tip the balance because of what FDA had determined in the 2020 guidance document. All right. If there are no more questions, thank you, Mr. Kennedy and Mr. Navar. Why don't you take two minutes? And in addition, I have a feeling my Thank you, Your Honor. And sure. So just to try to go through a few points quickly in response to the argument. So in going back to Judge Katz's original question, you know, as you know, I mean, under the ad law precedent, it's a reasonable person standard in terms of fair notice. What, you know, what a person in this is discussed in PHH Corp versus CFPB. And the part of the opinion, I know that went on BOC, but the part of the panel opinion that was reinstated discussing this issue, I've cited in the brief. But it's a reasonable person standard in terms of fair notice. And a petitioner would be held, or a regulated entity is held to what the standard is for an application like this. That's in PHH. It's in General Electric, et cetera. And so, but that has to work both ways. And so when the FDA issues a guidance document that says basically do some studies and choose some comparisons that you think are relevant, they can't then, you know, change the rule to say, well, I know you did some stuff, but it actually didn't address this particular question, which now we're making clear. That's the problem we've identified. And so when the FDA and the argument just now, I think it's inappropriate post-talk, but it's also inappropriate to rationalize why the evidence that was included in our applications was not sufficient. Because even if they looked at the evidence, they only looked at it, as we said in the brief, for this particular narrow question that was retroactively announced. And that's clear, by the way, from the text of the July 2021 memo itself as well, which says the FDA has determined that, you know, such and such is the standard, that they don't cite any prior documents, that that document is the first one that announces that narrow comparison that they want presented. And just a real quick point on the statutory burden. I don't think that Mr. Kennedy's, you know, argument makes it sound like the FDA's position is that there's sort of a, it's stacked against the petitioner, it's our burden, and but if you read the statutory standard, it actually, I think it's neutral. It just says the FDA shall deny an application if it finds X. So the question is still, does it find X? And last point is that, you know, again, so it's hard for the FDA to explain how they can approve views, which 10% of high school users of vapor products have admitted is their preferred brand, when they don't have any evidence that any of my petitioner's products are used by a the relevance of device type. All right. Well, I guess there are no questions. Okay. Thank you, gentlemen. And Madam Clerk, if you'd give us an adjournment, please.
judges: Henderson, Pillard, Katsas